IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

KELLY S. BREWER,              )    Case No. 5:16-cv-137

                                 )

       Plaintiff,           )    JUDGE PATRICIA A. GAUGHAN

                                 )

       v.                  )    MAGISTRATE JUDGE

                                 )    THOMAS M. PARKER

COMMISSIONER OF SOCIAL SECURITY,  )

                               )

       Defendant.       )    **REPORT AND RECOMMENDATION**

                               )

## I.    Introduction

Plaintiff, Kelly S. Brewer ("Brewer"), seeks judicial review of the final decision of the Commissioner of Social Security denying her application for supplemental security income benefits and disability insurance benefits under Title XVI of the Social Security Act ("Act"). This matter is before the court pursuant to 42 U.S.C. §405(g), 42 U.S.C. §1383(c)(3) and Local Rule 72.2(b).

For the reasons set forth below, it is recommended that the final decision of the Commissioner be VACATED and the case be REMANDED for further proceedings consistent with this Report and Recommendation.

## II.    Procedural History

Plaintiff applied for supplemental security income and disability insurance benefits in April 2013.  (Tr. 22)  Ms. Brewer alleged that her disability began on January 1, 2005. (Tr. 24)

Ms. Brewer's application was denied initially on August 1, 2013 (Tr.81) and after reconsideration on September 23, 2013. (Tr. 91)  On November 18, 2013, Ms. Brewer requested an administrative hearing. (Tr.111)

A hearing was held before Administrative Law Judge ("ALJ") Jeffrey Raeber on January 12, 2015. (Tr. 37)  The ALJ issued a decision on March 17, 2015 finding that Brewer was not disabled through March 31, 2007, the date she was last insured.  (Tr. 19-32)  Ms. Brewer requested a review of the hearing decision on April 10, 2015. (Tr. 17)  On December 21, 2015, the Appeals Council denied review, rendering the ALJ's decision final. (Tr. 1-4)

On January 20, 2016, Ms. Brewer filed an appeal of the ALJ's final decision in this court. (Doc. 1)  Defendant answered and filed the transcript of the administrative proceedings on May 9, 2016. (Docs. 15 and 16)  Ms. Brewer filed a brief on the merits on June 23, 2016 (Doc. 17) and Defendant filed her brief on the merits on August 8, 2016 (Doc. 18), making the matter ripe for review.

## III.    Evidence

### A.    Personal, Educational and Vocational Evidence

Kelly S. Brewer was born on April 11, 1978 and was 28 years old on the date she was last insured.  (Tr. 230)  Ms. Brewer is married and lives with her husband and two children.  (Tr. 47.)  She has a high school education and no past relevant work.  (Tr. 30)  The date she was last insured was March 31, 2007.  (Tr. 24)  Ms. Brewer has a history of childhood trauma and abuse. (Tr. 250)  She has severe mental and physical impairments. (Tr. 24)

### B.    Medical Evidence

#### 1.    Relevant Medical Records

Plaintiff's medical conditions include post-traumatic stress disorder, bipolar disorder, anorexia, bulimia, lupus, scleroderma, anxiety, and depression. (Tr. 72)  Plaintiff treated with Dr. Steven Richman from August 4, 2005 to June 18, 2006.  (Tr. 211-222)  Plaintiff's weight fluctuated between 105 and 110 pounds during that time period.  (Tr. 211-222)  In August 2005, plaintiff went to the doctor complaining of nausea and vomiting.  (Tr. 218)  She also reported having a hypoglycemic seizure.  (Tr. 218)  In September 2005, she told Dr. Richman she was an "emotional wreck."  (Tr. 216)

In November 2005, plaintiff complained of fatigue and multiple stressors. (Tr. 213)  Dr. Richman wrote her prescriptions to "[d]o something on purpose to treat yourself well every day," and "1) [e]very evening write down 3 things going well and 2) exercise."  (Tr. 212)

In December 2005, plaintiff continued to complain of fatigue and other symptoms. (Tr. 211)  Dr. Richman's notes indicate that plaintiff presented as tearful and anxious during treatment appointments, but that Lexapro was helping with her mental symptoms. (Tr. 211)  His treatment notes also document normal findings in plaintiff's respiratory and cardiovascular systems. (Tr. 211)

In early February 2006, plaintiff complained of insomnia and dealing with public places. (Tr. 222)  In late February 2006, she complained of insomnia and depression. (Tr. 221)

In April 2006, plaintiff presented to Anil M. Parikh, M.D., with symptoms of depression, anxiety and an eating disorder. (Tr. 235)  Plaintiff reported taking Lexapro for her symptoms. (Tr. 235)  She also reported that she had thoughts of suicide in November 2005 when she had stopped taking Lexapro and "went into a deeper depression."  (Tr. 235)  On mental status examination, Dr. Parikh noted that plaintiff's mood was depressed and anxious but her cognition

3

was intact and her insight and judgment were fair. (Tr. 236)  He diagnosed major depressive disorder, anorexia nervosa and panic disorder and assigned a GAF score of 55, with a high of 65 within the past year.  (Tr. 236)

Plaintiff started attending psychotherapy sessions with Kristine Jordan, LISW, in April 2006.  (Tr. 233)  At her first session, plaintiff discussed her relationship with her mother and her anxiety about going to a family function for Easter where she would encounter the cousin who molested her as a child. (Tr. 233)  She also reported that she was involved with a prison ministry and felt "very compelled by it."  (Tr. 233)  On April 28, 2006, plaintiff reported that her husband had cheated on her last Fall and she believed that his infidelity "encouraged" her eating disorder. (Tr. 233)

On May 4, 2006, plaintiff continued to struggle with family stressors but felt that the medication and treatment were helping. (Tr. 233)  She also continued to struggle with her eating disorder but had not lost any more weight. (Tr. 233)  Later in May 2006, plaintiff reported that she felt her husband was more devoted and committed to her. (Tr. 232)

In June 2006, the therapist noted that plaintiff was continuing to have difficulty with lack of energy and motivation.  (Tr. 234)  However, she also noted that plaintiff was maintaining her weight at around 106 pounds and her target weight was 110.  (Tr. 234)

In August 2006, the therapist reviewed counseling techniques to identify and manage anger and control issues. (Tr. 231)  Notes from August 4, 2006 state that plaintiff was continuing to do well on medication.  (Tr. 231)  At the end of August, plaintiff had gained two pounds and reported that she was starting to sell products for Avon, which she was excited about.  (Tr. 231)

In September 2006, plaintiff experienced some regression of her symptoms which was mostly attributed to the fact that her mother was staying with her for a week, but she was doing

4

well with the goals she set for herself.  (Tr. 231)  Plaintiff expressed concerns regarding gaining and losing weight throughout her psychotherapy in 2006.   (Tr. 233-234)

In March 2007,  plaintiff reported that she was doing well.  (Tr. 230)  She had gained six pounds and was planning on attending a women's retreat that Friday. (Tr. 230)  She also reported that she was continuing to babysit for extra money.  (Tr. 230)   Plaintiff reported that her involvement with church and a small women's group continued to be supportive.  (Tr. 230)

In April 2007, plaintiff felt a significant increase in depression and she was not eating. (Tr. 230)  The regression was attributed to her mother writing a letter to the cousin that molested plaintiff, which made plaintiff feel betrayed, hurt and angry. (Tr. 230)

In May 2007, plaintiff was continuing to do "fair" on the medication. (Tr. 230)   She felt better on an increased dose of Lexapro. (Tr. 230)  She was becoming easily agitated at times, but was doing fair in regards to eating. (Tr. 230)  Plaintiff weighed 120 pounds, the most she ever weighed while treating with Ms. Jordan.  (Tr. 229)

In June 2007, plaintiff reported that she had gotten into a fight with her husband. (Tr. 229)  Plaintiff reported that she had only felt safe in her closet. (Tr. 229)  She admitted that she had not taken her medication that day. (Tr. 229) She reported that she was doing better with her anorexia.  She had maintained a healthy weight, was gaining weight, and felt comfortable with this. (Tr. 229)

Also in June 2007, plaintiff reported to Dr. Richman that for the last year she had been experiencing weakness, tiredness, significant lethargy including having a difficult time getting out of bed and tingling in her legs. (Tr. 219)

In July 2007, plaintiff reported that she was doing fair and was renewing relationships with family members. (Tr. 228)  She weighed 132 pounds, which was her goal weight. (Tr. 228)

Ms. Brewer continued to have significant mental health issues following the date last insured over the years 2007-2009.  She was diagnosed with bipolar, manic thoughts, intense anxiety and fearfulness. (Tr. 222-230, 238-243)

In 2010, during a therapy session with Dr. A.C. Ciancone, plaintiff reported an attempt to kill herself five years earlier. (Tr. 250)   In 2010-2012, she was diagnosed with PTSD, bipolar, panic attacks, agoraphobia, and borderline personality disorder. (Tr. 244-249)

Mental health treatment continued for long term PTSD, depression, anxiety and mood swings from 2010 to early 2013.  Her issues with weight, outbursts of anger, mood swings, and difficulties in processing stress continued.  (Tr. 317-347)  In June 2012, she reported constant, worsening pain and stated that her "bones hurt all the time."  (Tr. 297)

In 2012, she reported to Dr. May Zem that she had been having trouble with pain for many years and that her pain had been worsening over the past ten years.  (Tr. 264)

Progress notes from January 2013 indicate that plaintiff had seen a rheumatologist and had been diagnosed with lupus and scleroderma. (Tr. 295)  In June 2013, plaintiff reported speech and memory recall issues.  (Tr. 368)

### C.     Opinion Evidence

#### 1.     Kristine Jordan – May 2013

Plaintiff's treating therapist, Kristine Jordan, LISW, completed a medical source assessment of plaintiff's mental abilities in May 2013. (Tr. 382-383)  Ms. Jordan opined that plaintiff would be unable to remember short and simple instructions, detailed instructions, locations, and work-like procedures on any sustained or regular basis.  (Tr. 382)  She would further be unable to maintain attention for extended periods of time, complete a normal workday, travel to unfamiliar places, and would be unable to set realistic goals. (Tr. 383)  She opined that

plaintiff's mental limitations would cause noticeable difficulty in her ability to interact socially and her ability to adapt to changes in a work setting. (Tr. 383)  Ms. Jordan assessed that plaintiff's impairments would cause her to miss more than four days of work per month.  (Tr. 383)

### 2.      William Kedia, M.D. – July 2013

On July 2, 2013, Dr. A. William Kedia completed two questionnaires assessing the limiting effects of scleroderma and lupus.  (Tr. 373-376)  Dr. Kedia opined that the diagnosis of scleroderma and lupus would preclude any work related physical activity and would result in the "complete incapacitation of a patient's life activities." (Tr. 374)  He also opined that these diseases would manifest in the symptoms of "fatigue, anxiety, depression, insomnia, memory issues…" amongst other symptoms. (Tr. 373)  Dr. Kedia opined that plaintiff could lift less than five pounds, stand/walk for 30 minutes at a time, for two hours total; sit one hour at a time, for two hours total; could not engage in postural activities; would be off task at least 25% of the time; and would miss more than four days of work per month. (Tr. 373-376)

### 3.      Reviewing Physicians/Psychiatrists

William Bolz, M.D. was asked to review plaintiff's medical records on behalf of the agency in July 2013.  Dr. Bolz stated that there was insufficient evidence to fully assess plaintiff's claim.  (Tr. 76, 78-79)

Also in July 2013, Kristen Haskins, Psy.D., a state psychological consultant, reviewed plaintiff's records related to her mental impairments.  (Tr. 77)  Dr. Haskins also indicated that there was insufficient evidence during the period from the alleged onset date to the last insured date. (Tr. 77)

7

Similarly, Teresita Cruz, M.D., was unable to provide a medical opinion regarding plaintiff's impairments in September 2013 due to insufficient evidence. (Tr. 87)  She reported that there was insufficient evidence to fully assess the claim. (Tr. 87)

### D.   Testimonial Evidence

#### 1.   Testimony of Kelly Brewer

A hearing took place in this matter on January 12, 2015 before ALJ Raeber.  (Tr. 37-71) Ms. Brewer's first attorney withdrew as attorney of record on November 18, 2013.  (Tr. 111) Despite not being represented by counsel, Ms. Brewer appeared for the administrative hearing on January 12, 2015 and elected to go forward without counsel. (Tr. 40)  Ms. Brewer's spouse, David Brewer, also attended and testified at the hearing. (Tr. 39)

At the outset of the hearing, the ALJ advised Ms. Brewer of her rights regarding representation.  Specifically, the ALJ entered into the following dialogue with Ms. Brewer:

> ALJ:  * * * I note that you're not represented by an attorney, so I need to ensure that you understand your rights to representation.  Before the hearing, we sent you a notice of hearing which indicated you have a right to be represented by an attorney or other qualified person of your choice.  The letter also informed you that there are agencies that will represent you free of charge if you qualify.  Did you receive this letter?
>
> CLMT:  Yes.
>
> ALJ:  Okay.  A representative can help you obtain information about your claim, submit evidence, or explain medical terms, and some may not - - well, they may not charge a fee or receive a fee unless the Social Security Administration approves it.  If you appoint a representative, you may be responsible for certain expenses, such as obtaining medical records or copying the records.
>
> Were you intending on - - or requesting additional time to obtain representation, or were you going forward without representation?
>
> CLMT:  Go forward.

8

Ms. Brewer then signed a document indicating that she waived her right to representation during the hearing. (Tr. 40-41)

At the time of the hearing, plaintiff lived with her husband and two children, ages seventeen and eighteen. (Tr. 47)  Her husband drove her to the hearing. (Tr. 47)  She testified that she had not driven in over a year. (Tr. 47)  She further testified that, for the past three years, she typically spent 20-22 hours in bed each day. (Tr. 47)

Plaintiff had one job in the fifteen years leading up to the alleged onset date of her disability.  (Tr. 46)  She testified that she worked in the daycare room at the Jewish Center for about two years.  (Tr. 44-45)  She would help watch young children while their parents exercised. (Tr. 45)

Plaintiff is 5'6" and, at the time of the hearing estimated her weight to be between 125and128 pounds. (Tr. 47)   She testified that when she was 27 years old she weighed only 86 pounds.  (Tr. 52)  She was then prescribed an antipsychotic medicine that caused her to gain weight. (Tr. 52)  Her weight had gotten as high as 155 pounds after taking the medication.  (Tr. 53)

In 2005, plaintiff abruptly quit her job at the Jewish Center.  (Tr. 48)  Six to eight months later, she tried to take her own life.  (Tr. 48-49)  When the rest of her family was sleeping, she got her husband's gun and tried to shoot herself in the chest.  (Tr. 53)  The gun misfired, so plaintiff cocked the gun again but her husband heard it and wrestled the gun away from her.  (Tr. 53)  She was not seeing a counselor at the time this happened.  (Tr. 54)

Plaintiff had stopped going to church after she felt that she had been "attacked" by people at church who were trying to talk to her in a closed room.  (Tr. 60-61)

Plaintiff testified that she hears voices and has heard these voices since she was about seven years old.  (Tr. 52)  She attributed these voices to her condition of post-traumatic stress disorder. (Tr. 68)  She also testified that, at times, she burned and cut herself.  (Tr. 54)  Plaintiff testified to a history of mental impairments and abuse. (Tr. 60)  When she was pregnant with her daughter, her mother broke her jaw. (Tr. 60)

Plaintiff testified that she has been diagnosed with a rare form of scleroderma, which causes her organs to thicken or harden. (Tr. 54)  She has also been diagnosed with lupus, which attacks her organs.  (Tr. 55)  Plaintiff testified that she was not receiving any treatment for these conditions because there is no known cure for them.  (Tr. 62)  She testified that she did not want her family to go into debt due to her medical conditions.  (Tr. 65)   Plaintiff felt responsible for the foreclosure of their house because her husband had taken off work to care for her so that she wouldn't harm herself.  (Tr. 65)  In the past year, plaintiff had gone to the doctor one time for a bladder infection. (Tr. 62)  She was not treating for her other conditions.  (Tr. 63)

In 2007, plaintiff reported that she was unable to lift anything and that her children lifted everything for her. (Tr. 55)  She could not hold things very well with her hands, which she thought may have been caused by lupus, which had not yet been diagnosed. (Tr. 55)

At the time of the hearing, plaintiff was taking Celexa for depression, Vistaril for panic attacks and Tramadol for pain.  (Tr. 56)  She was using a wheelchair and had a seated walker she used at home. (Tr. 50)  She was also using oxygen at the hearing and had been doing so for the past two and a half years. (Tr. 50)  The oxygen had been prescribed by Dr. Kedia. (Tr. 50)

## 2.    Testimony of David Brewer

Plaintiff's spouse, David Brewer, also testified at the hearing. (Tr. 57-71)  Mr. Brewer testified that much of plaintiff's anxiety, like hearing voices, stemmed from her childhood.  (Tr.

10

57)  He stated that she is an insomniac and had slept for approximately ten hours in a whole

month.  (Tr. 57)  She would lie in bed but didn't sleep.  (Tr. 57)  Twice in the last six months her

legs had given out and she had been unable to walk for about a month.  (Tr. 57)

Mr. Brewer testified that, in 2005 to 2007, Ms. Brewer was mobile; she was able to cook

and do laundry.  (Tr. 58)  She was able to go for walks in the park.  (Tr. 58)  However, at the

time of the hearing, she was no longer able to go to the park. (Tr. 58)  The last time she had done

that was two to three years before the hearing.  (Tr. 58)

Also approximately two to three years before the hearing, Ms. Brewer had been lying on

the couch for four days straight.  (Tr. 59)  Mr. Brewer insisted that she go to the doctor.  (Tr. 59)

The doctor did blood work and Ms. Brewer was diagnosed with scleroderma at that time. (Tr.

59)

Mr. Brewer testified that there were a couple of years in which they were living in South

Carolina.  (Tr. 64)  While in South Carolina, they did not have insurance. (Tr. 64)  They came

back to Ohio in December 2013.  (Tr. 64)   He then found work and they were able to get

insurance again in September.  (Tr. 64)  However there were spans of time when they didn't

have insurance and Ms. Brewer was unable to receive any treatment. (Tr. 65)  He also testified

that he was required to take off work for some time to take care of her.  (Tr. 65)

### 3.    Vocational Expert's Evidence

Rather than having a vocational expert present at the hearing, the ALJ sent a CD with

exhibits to a vocational expert ("VE"), Mark Anderson, for review. (Tr. 190-194)  The

transmittal letter indicated that the CD contained "exhibits selected for inclusion in this case."

(Tr. 190)  There is no indication in the record whether the CD contained the same exhibits

admitted in evidence at the hearing.  The VE did not hear the evidence adduced at the hearing

from Ms. Brewer or her husband.  After reviewing the exhibits, the VE completed a vocational interrogatory form.  (Tr. 191-194)  In this interrogatory, the VE indicated that he believed that Ms. Brewer had work experience in the past 15 years as a daycare worker, and a laundry worker. (Tr. 191)

The ALJ asked the VE to assume a hypothetical individual the same age and with the same education and work experience as plaintiff.  The VE was instructed that the hypothetical individual had the residual functional capacity to perform sedentary work except that she could stand and walk for about 6 hours and could sit for 6 hours in an 8-hour work day.  She could never climb ladders, ropes or scaffolds.  She could occasionally climb ramps or stairs.  She must avoid the use of moving machinery, commercial driving, and unprotected heights.  She could perform detailed but not complex tasks.  Her work environment must be free of fast-paced production requirements and routine work place changes.  The individual could do no tasks involving arbitration, negotiation, confrontation, directing the work of others, persuading others or being responsible for the safety or welfare of others. (Tr. 192)

The VE opined that such a hypothetical individual would not be able to perform any of plaintiff's past work. (Tr. 192)  However, he believed that this individual would be able to perform the jobs of: 1) document preparer with approximately 180,000 jobs in the national economy; 2) touch-up screener with approximately 158,000 jobs in the national economy; and 3) bonder with approximately 110,000 such positions in the national economy. (Tr. 193, 30)

## IV.    Standard for Disability

Under the Act, 42 U.S.C. § 423(a), eligibility for benefit payments depends on the existence of a disability. "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which

can be expected to result in death or which has lasted or can be expected to last for a continuous

period of not less than 12 months." 42 U.S.C. § 423(d)(1)(a). Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or
> mental impairment or impairments are of such severity that he is not only unable to
> do his previous work but cannot, considering his age, education, and work
> experience, engage in any other kind of substantial gainful work which exists in the
> national economy[1]....

42 U.S.C. § 423(d)(2)(A).

In making a determination as to disability under this definition, an ALJ is required to

follow a five-step sequential analysis set out in agency regulations. The five steps can be

summarized as follows:

1. If the claimant is doing substantial gainful activity, he is not disabled.

2. If claimant is not doing substantial gainful activity, his impairment must be severe
   before he can be found to be disabled.

3. If claimant is not doing substantial gainful activity, is suffering from a severe
   impairment that has lasted or is expected to last for a continuous period of at least
   twelve months, and his impairment meets or equals a listed impairment,[13]
   claimant is presumed disabled without further inquiry.

4. If the impairment does not meet or equal a listed impairment, the ALJ must assess
   the claimant's residual functional capacity and use it to determine if claimant's
   impairment prevents him from doing past relevant work. If claimant's impairment
   does not prevent him from doing his past relevant work, he is not disabled.

5. If claimant is unable to perform past relevant work, he is not disabled if, based on
   his vocational factors and residual functional capacity, he is capable of
   performing other work that exists in significant numbers in the national economy.

20 C.R.F. §§ 404.1520, 416.920; *Bowen v. Yuckert,* 482 U.S. 137, 140-142 (1987).  Under this

sequential analysis, the claimant has the burden of proof at Steps One through Four. *Walters v.*

*Comm'r of Soc. Sec.* 127 F.3d 525, 529 (6th Cir. 1997).  The burden shifts to the Commissioner

---

[1] "'[W]ork which exists in the national economy' means work which exists in significant numbers either in the
region where such individual lives or in several regions of the country." 42 U.S.C. § 423 (d)(2)(A).

at Step Five to produce evidence that establishes whether the claimant has the RFC and

vocational factors to perform work available in the national economy. *Id.*

## V.     The ALJ's Decision

The ALJ issued a decision on March 17, 2015.  A summary of his findings is as follows:

1.  Ms. Brewer last met the insured status requirements of the Social Security Act
    on March 31, 2007.  (Tr. 24)

2.  Ms. Brewer did not engage in substantial gainful activity during the period
    from her alleged onset date of January 1, 2005 through her date last insured of
    March 31, 2007. (Tr. 24)

3.  Through the date of last insured [March 31, 2007], Ms. Brewer had the
    following severe impairments: anorexia nervosa, major depressive disorder –
    single episode, panic disorder, posttraumatic stress disorder, borderline
    personality disorder, obsessive-compulsive traits and bipolar disorder. (Tr. 24)

4.  Through the date last insured, Ms. Brewer did not have an impairment or
    combination of impairments that met or medically equaled the severity of one
    of the listed impairments. (Tr. 25)

5.  Through the date of last insured, Ms. Brewer had the residual functional
    capacity to perform sedentary work, except she could stand and walk for
    about six hours and for up to six hours in an eight-hour workday.  She could
    never climb ladders, ropes or scaffolds.  She could occasionally climb ramps
    or stairs.  She had to avoid the use of moving machinery, commercial driving,
    and unprotected heights.  She could perform detailed but not complex tasks.
    The work environment had to be free of fast-paced production requirements
    and routine workplace changes.  Ms. Brewer could not do any tasks involving
    arbitration, negotiation, confrontation, directing the work of others,
    persuading others, or being responsible for the safety or welfare of others. (Tr.
    26-27)

6.  Ms. Brewer had no past relevant work. (Tr. 30)

7.  She was born on April 11, 1978 and was 28 years old, which is defined as a
    younger claimant individual age 18-44, on the date last insured. (Tr. 30)

8.  Ms. Brewer had at least a high school education and was able to communicate
    in English. (Tr. 30)

9.  Transferability of job skills was not an issue because Ms. Brewer did not have
    past relevant work. (Tr. 30)

14

      10. Through the date last insured, considering the claimant's age, education, work experience and residual functional capacity, there were jobs that existed in significant numbers in the national economy that claimant could have performed. (Tr. 30)

Based on the foregoing, the ALJ determined that Ms. Brewer had not been under a disability from January 1, 2005, the alleged onset date, through March 31, 2007, the date last insured. (Tr. 31)

## VI.  The Parties' Arguments

Plaintiff filed her brief on June 23, 2016. (Doc. 17) Plaintiff asserts the following arguments in her brief:

1) The ALJ did not properly assess whether plaintiff was competent to proceed in the hearing unrepresented by counsel;

2) The ALJ failed to fully develop the record. With regard to this argument, plaintiff asserts that the ALJ's duty respecting record development was heightened because she was unrepresented. She also cites case law holding that "when a claimant fails to understand the proceedings because of her mental condition, a denial of benefits is a denial of due process." *Parker v. Califano,* 644 F.2d 1199, 1203 (6th Cir. 1981).

3) No Vocational Expert testified at the hearing. Plaintiff contends that the process employed by the ALJ of submitting a transcript to a VE and proffering interrogatories completed by the VE to plaintiff was improper as applied to her because she lacked the competency to understand how to proceed with this information and was not represented by counsel who could advise her. Consequently, plaintiff contends that the ALJ failed in satisfying the government's burden to show that jobs existed in significant numbers in the national economy which she was capable of performing.

4)  The ALJ improperly evaluated whether plaintiff's impairments met or medically equaled Listings 12.04 and 12.06.  Specifically, plaintiff argues that the ALJ improperly weighed the evidence in plaintiff's medical records when he determined that her restrictions and difficulties were "moderate."

5)  Plaintiff also argues that the ALJ improperly evaluated the evidence related to whether her condition of Scleroderma met Listing 14.04.  In fact, plaintiff contends that the ALJ did not conduct any analysis to determine whether plaintiff met this Listing.

6)  Finally, plaintiff contends that the ALJ improperly assessed her credibility in light of the medical source statements submitted by Kristine Jordan and Dr. Kedia.  Plaintiff argues that her credibility should not have been discounted because she did not obtain a correct diagnosis for a long period of time.  Plaintiff argues that, if the symptoms she experienced earlier were linked to her subsequently diagnosed condition, there would have been no reason to question her credibility or the medical source statements submitted by Kristine Jordan and Dr. Kedia related to this condition.

Defendant filed a brief on August 8, 2016. (Doc. 18)  Defendant argues that the ALJ adequately advised plaintiff of her right to representation and that plaintiff received a full and fair hearing. Defendant argues that the ALJ's use of an interrogatory form from a vocational expert was proper because the ALJ sent the interrogatory to plaintiff and gave her an opportunity to object. Defendant also argues that the ALJ properly evaluated plaintiff's mental impairments at step three of the sequential evaluation process.  Defendant contends that the ALJ properly accorded little weight to plaintiff's treating therapist, Ms. Jordan, because she was not an acceptable medical source and because there was no indication that her opinions, expressed several years after plaintiff was last insured, related back to the period of January 1, 2005 to

16

March 31, 2007.  Similarly, defendant argues that the ALJ properly assigned little weight to the

opinion of Dr. Kedia because it was issued more than six years after plaintiff was last insured.

Finally, defendant argues that the ALJ properly determined that plaintiff did not have a physical

impairment meeting Listing 14.04 during the relevant period because plaintiff was not diagnosed

with the impairments of lupus and scleroderma until after the date she was last insured.

## VII.    Law & Analysis

### A.    Standard of Review

This court's review is limited to determining whether there is substantial evidence in the

record to support the ALJ's findings of fact and whether the correct legal standards were applied.

*See Elam v. Comm'r of Soc. Sec.,* 348 F.3d 124, 125 (6th Cir. 2003) ("decision must be affirmed

if the administrative law judge's findings and inferences are reasonably drawn from the record or

supported by substantial evidence, even if that evidence could support a contrary decision.");

*Kinsella v. Schweiker,* 708 F.2d  1058, 1059 (6th Cir. 1983).  Substantial evidence has been

defined as "more than a scintilla of evidence but less than a preponderance; it is such relevant

evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v.*

*Comm'r of Soc. Sec.,* 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and*

*Human Servs.,* 25 F.3d 284, 286 (6th Cir. 1994).

The Act provides that "the findings of the Commissioner of Social Security as to any fact,

if supported by substantial evidence, shall be conclusive."  42 U.S.C. §§ 405(g) and 1383(c)(3).

The findings of the Commissioner are not subject to reversal merely because there exists in the

record substantial evidence to support a different conclusion.  *Buxton v. Halter,* 246 F.3d 762,

772-3 (6th Cir. 2001) (*citing Mullen v. Bowen,* 800 F.2d 535,545 (6th Cir. 1986); *see also Her v.*

*Comm'r of Soc. Sec.,* 203 F.3d 288, 389-90 (6th Cir. 1999) ("Even if the evidence could also

support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached." *See Key v. Callahan,* 109 F.3d 270, 273 (6th Cir. 1997). This is so because there is a "zone of choice" within which the Commissioner can act, without the fear of court interference. *Mullen,* 800 F.2d at 545 (*citing Baker v. Heckler,* 730 F.2d 1147, 1150 (8th Cir. 1984).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the court must determine whether proper legal standards were applied. Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal. *See e.g. White v. Comm'r of Soc. Sec.* 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.,* 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.")

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue,* 774 F.Supp.2d 875, 877 (N.D. Ohio 2011) (*quoting Sarchet v. Chater,* 78 F.3d 305, 307 (7th Cir. 1996); *accord Shrader v. Astrue,* No. 11-13000, 2012 U.S. Dist. LEXIS 157595 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue,* No. 1:10-cv-734, 2011 U.S. Dist. LEXIS 141342 (S.D. Ohio Nov. 15, 2011); *Gilliams v. Astrue,* No. 2:10-CV-017, 2010 U.S. Dist. LEXIS 72346 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, No. 1:09-cv-19822010, 2010 U.S. Dist. LEXIS 75321 (N.D. Ohio July 9, 2010).

### B.     Whether the ALJ Fully and Fairly Developed the Record

Plaintiff argues that the ALJ failed to fully develop the record and that he had a

heightened duty because claimant was unrepresented at the hearing.  Although a claimant

seeking disability benefits bears the ultimate burden of establishing her entitlement to such

benefits, the ALJ has an affirmative duty to fully develop the factual record upon which his

decision rests. *Lashley v. Secretary of Health & Human Services,* 708 F.2d 1048 (6th Cir. 1983).

The ALJ's duty applies in every case, regardless of whether or not the claimant is represented by

legal counsel. *Id*.; *Osburn v. Apfel,* No. 98-1784, 1999 U.S. App. LEXIS 16220 at *7 (6th Cir.

July 9, 1999) [quoting *Richardson v. Perales,* 402 U.S. 389, 411, 91 S. Ct. 1420, 28 L. Ed. 2d

842 (1971) ("the responsibility for ensuring that every claimant receives a full and fair hearing

lies with the administrative law judge")]; *Echevarria v. Sec'y of Health and Human Services*, 685

F.2d 751, 755 (2nd Cir. 1982) ("given the non-adversarial nature of a benefits proceeding, the

ALJ 'must himself affirmatively develop the record.'"). See also *Sims v. Apfel,* 530 U.S. 103,

110-11, 120 S. Ct. 2080, 147 L. Ed. 2d 80 (2000) (although the claimant bears the ultimate

burden of establishing that he is entitled to disability benefits, courts have recognized that social

security proceedings are "inquisitorial rather than adversarial," and it is the ALJ's duty to

investigate the facts and develop arguments both for and against granting benefits).

When a disability claimant is not represented by counsel at the administrative hearing, the

ALJ has a special duty to ensure that a full and fair administrative record is developed. *Lashley,*

708 F.2d at 1051; *Nabours v. Commissioner of Social Security,* 50 F. App'x 272, 275 (6th Cir.

2002).  This heightened duty arises from the remedial nature of the Social Security Act, as well

as from the recognition that the ultimate responsibility for ensuring that every claimant receives a

full and fair hearing lies with the administrative law judge. *Lashley*, 708 F.2d at 1051 (citing

*Richardson*, 402 U.S. 389).  Moreover, the ALJ must take special care to ensure he fulfills his

duty in situations where the unrepresented claimant suffers from a mental impairment. *Thrasher v. Comm'r of Soc. Sec.,* 2013 U.S. Dist. LEXIS 15958, (S.D. Ohio Feb. 6, 2013) (citing *Morlando v. Astrue,* No. 3:10cv1258, 2011 U.S. Dist. LEXIS 106810 at *4 (D. Conn. Sept. 20, 2011) (recognizing that in addition to the "special solicitude" the ALJ must show pro se claimants, "extra care" is required where a claimant's mental capacity is in question).  To satisfy his heightened duty to develop the record, the ALJ must "scrupulously and conscientiously probe into, inquire of, and explore for all the relevant facts," and he must be "especially diligent in ensuring that favorable as well as unfavorable facts and circumstances are elicited." *Lashley*, 708 F.2d at 1052 (citations omitted).

The determination of whether the ALJ has satisfied his duty to fully and fairly develop the record is not amenable to the application of bright line tests, but instead must be made on a case-by-case basis. *Lashley*, 708 F.2d at 1052; *Duncan v. Sec'y of Health and Human Services,* 801 F.2d 847, 856 (6th Cir. 1986).  In making this determination, "the key inquiry is whether the administrative law judge fully and fairly developed the record through a conscientious probing of all relevant facts." *Rowden v. Chater*, No. 95-5630, 1996 U.S. App. LEXIS 17295, *1 (6th Cir. June 3, 1996).

The court in *Vaca v. Comm'r of Soc. Sec.,* No. 1:08-cv-653, 2010 U.S. Dist. LEXIS 19515, at *6 (W.D. Mich. Mar. 4, 2010) explained that a failure to fully develop the factual record is often found in cases where the ALJ conducted only superficial or perfunctory questioning, as well as in cases where the ALJ failed to obtain all available medical records and documentation. (citing *Lashley*, 708 F.2d at 1052) (ALJ failed to fulfill his duty to fully develop the record where he only superficially questioned the claimant concerning his daily activities and his physical limitations); *Rogers v. Sec'y of Health and Human Services,* 786 F.2d 1166, 1986

WL 16548, at *3 (6th Cir. 1986) (ALJ failed to fully develop the record where he neither conducted any inquiry into the claimant's emotional problems nor attempted to more fully understand his physical limitations); *Frank v. Chater*, 924 F.Supp. 416, 428-29 (E.D.N.Y. 1996) ("the ALJ's cursory examination of [the claimant] was insufficient considering the importance to be accorded a claimant's testimony"), abrogated on other grounds, *Lamay v. Commissioner of Social Sec.*, 562 F.3d 503 (2nd Cir. 2009)). But see *Nabours*, 50 F. App'x at 275-76 (the ALJ did not err by failing to fully develop the administrative record where the record showed that the pro se plaintiff was able to put on her case with no discernible problems, she was "sufficiently articulate in her direct testimony, she mustered an impressive amount of supporting medical evidence, and she was attuned enough to the testimony of the VE so that she was able (with the help of the ALJ) to conduct cross-examination and cause the ALJ to submit a new hypothetical question to the VE."); *Wilson v. Comm'r of Soc. Sec.*, 280 F. App'x 456, 459 (6th Cir. 2008) (holding ALJ did not have special duty to develop the record where although the claimant chose to proceed without counsel, the hearing transcript disclosed her grasp of the proceedings and the adequacy of her case presentation to the ALJ).

In the case at bar, Ms. Brewer was unrepresented at the hearing and suffers from diagnosed psychological conditions.  (Tr. 24, 40)  Accordingly, the ALJ had a special duty to ensure that a full and fair administrative record was developed.  While it may have been difficult to develop the record because claimant's date of last being insured was six years prior to the hearing, the undersigned finds that the ALJ did not fairly and fully develop the administrative record in this case.  During the hearing, the ALJ attempted to direct the claimant and her husband to provide testimony related to the period between the alleged disability onset date of January 1, 2005 and March 31, 2007, the date last insured.  However, his questioning was limited and he

did not resolve some apparent conflicts in the testimony.  Ms. Brewer testified that she was

hearing voices in 2005.  (Tr. 52)  She also testified that she weighed 86 pounds in 2005. (Tr. 52)

She testified that she could not lift anything in 2007 because her hands didn't work.  (Tr. 55)

Ms. Brewer also testified that, although she was not diagnosed until 2013, she didn't know how

long she had been suffering from scleroderma or lupus. (Tr. 54-55)  She testified that her lupus

symptoms may have been manifesting as early as 2007.  (Tr. 55)  However, the ALJ did not ask

any questions to further explore these statements and even changed the subject of his questioning

after they were made.  (Tr. 55)

     During his testimony, Mr. Brewer stated that plaintiff was mobile, cooked meals and did

laundry in 2005 to 2007. (Tr. 58)  However, the ALJ did not ask any follow-up questions related

to this statement or the seeming contradiction between this statement and Ms. Brewer's

testimony that she could not use her hands during that time period. (Tr. 55, 58-59)  Thus, it is

difficult to discern from this testimony what plaintiff's actual limitations were in the relevant

time period.  Moreover, the ALJ assigned little weight to Mr. Brewer's opinions.  (Tr. 29)

     The ALJ also failed to develop the record in his written questioning of the Vocational

Expert.  (Tr. 191-193)  The VE did not testify at the hearing and the ALJ only asked the VE to

consider a single hypothetical individual who was able to perform sedentary work with certain

exceptions.  (Tr. 192)  The court cannot discern, from the ALJ's decision, what his basis was for

the facts assumed in the hypothetical question submitted to the VE.  The court cannot discern

what medical evidence was submitted to the VE on the CD he was sent.  Further, the VE did not

see or hear Ms. Brewer's testimony and Ms. Brewer was not given an opportunity to question the

VE.  Although the ALJ did send the interrogatory form completed by the VE to Ms. Brewer, she

was unrepresented at the time and "had no idea how to object to the VE's statement."  (Doc. 17, p. 15)

The ALJ also failed to develop the record in regard to the medical opinions in this case. In considering whether the plaintiff's impairments met or medically equaled any of the listed impairments, the ALJ stated that "no treating or examining physician has indicated findings that would satisfy the severity requirements of any listed impairments * * *." (Tr. 25) Although this is a true statement, part of the reason for that is that all three reviewing physicians declined to express full opinions on the limited information available to them.  (Tr. 76-78)  Despite the limitations on what the reviewing physicians were willing to opine, the ALJ stated that "he considered the opinion of the State Agency medical consultants who evaluated the issue at the initial and reconsideration levels of the administrative review process and reached the same conclusion." (Tr. 25)  Nevertheless, the ALJ later assigned "little weight" to the opinions of the reviewing physicians.  (Tr. 29)

The ALJ also assigned little weight to the opinion of Kristine Jordan, LISW, who was plaintiff's therapist during the relevant time period.  Even though he determined Ms. Jordan's opinions to be of little value, the ALJ relied heavily on his own interpretation of Ms. Jordan's notes during the time period.  He chose to assign little weight to her opinion because she was not a medically acceptable source and because she offered her assessment of plaintiff's limitations over six years after the date last insured, "with no indication that her opinion applied back to such a remote period."  (Tr. 29)  While it is true that Ms. Jordan did not state whether her opinion related back to the relevant time period, nothing in the record suggests the ALJ did anything to seek clarification from her on that issue before he discounted Jordan's views and decided the case.

23

Similarly, the ALJ assigned little weight to the opinion of treating source Dr. Kedia. (Tr. 29)  Unlike Ms. Jordan, Dr. Kedia is an acceptable medical source.  With regard to Dr. Kedia's opinion, the ALJ stated that the medical record during the relevant 2005-2007 period did not establish any substantial exertional limitations or physical deficits.  The ALJ also stated that the claimant did not complain of any symptoms related to scleroderma or lupus during the relevant period and that Dr. Kedia did not treat her during that time period.  (Tr. 29)  As with the counselor, the ALJ did nothing to investigate whether Dr. Kedia intended his 2013 statements of opinion to relate back to the relevant period.

The ALJ concluded that plaintiff was not complaining of these symptoms during the relevant time period, but cited to no evidence of record to explain this conclusion.  Further, the ALJ never developed the record to the point that it reflected what the symptoms of scleroderma and lupus are.  Without that, neither the ALJ nor the court has a basis for concluding whether the multiple symptoms plaintiff experienced from 2005-2007 were possibly supportive of the conclusion that plaintiff's scleroderma and lupus had begun by then.  There is no medical source opinion which states that Ms. Brewer was not experiencing the symptoms of lupus and/or scleroderma in the relevant time period.  (Tr. 29)    Plaintiff complained of fatigue and depression during the relevant time period. (Tr. 213, 221, 234, 236)  She also complained of a seizure in 2005. (Tr. 218)  Despite these facts, the ALJ simply concluded that plaintiff's fatigue was caused by her anorexia without any medical opinion to support this conclusion.  (Tr. 29)

Because there was no medical source opinion supporting his conclusion that plaintiff was not complaining of symptoms related to lupus or scleroderma during the relevant time period, the ALJ's questioning of Ms. Brewer during the hearing became particularly significant.  The ALJ could have thoroughly questioned Ms. Brewer regarding the symptoms of scleroderma and lupus

during the relevant period (assuming he knew what they were).  However, as stated above, the

ALJ did not fully develop the record at this critical point.  The following colloquy took place

during the hearing:

> Q.  Okay.  All right.  Now, you've mentioned a couple of times about another
> condition that you have.  I guess that was diagnosed a couple of years ago,
> that your aunt had.  What condition is that?
>
> A.  It's a rare form of a - - called scleroderma.  It's called scleroderma, sine
> scleroderma.  And what it is, is – there is different types.  The main type is
> where people notice.  It's the skin form, the skin thickening.  And then there is
> the form where it's - - the rare form, where it's organ.  And I have the all-
> organ, which makes it fatal because - -
>
> Q.  You have the organ - -
>
> A.  Organ form.
>
> Q.  Okay.
>
> A.  Which makes it fatal because, basically, my organs are hardening.
>
> Q.  Okay. And when was this diagnosed?
>
> A.  No.  I'm on my third year right now.  So it would be – it will be three years
> because three years from diagnosis, I'm going from.  But they don't know
> how long I've had it.  That's the problem because you can't tell.  They usually
> - - the only - - I'm lucky it got diagnosed because usually they can't diagnose
> it until you're on the autopsy table, actually.  It's not very well known.
>
> Q.  Okay.  Any other conditions?
>
> A.  I have lupus as well, and it also is the organ form.  It is not the skin form, so
> that is what also is attacking my organs.
>
> Q.  All right.  Any other conditions?

(Tr. 55)  The ALJ did not ask any follow-up questions to learn what plaintiff understood the

symptoms of these conditions to be or when she first started to experience them.

Such questioning, or a lack thereof, is even more significant here because all three

reviewing medical sources indicated that there was insufficient evidence in the record to

25

determine whether Ms. Brewer had these conditions during the relevant time period.  (Tr. 76, 78)
Indeed, their indication that there was insufficient evidence should have raised a red flag to the
ALJ that the record was not fully developed and that meticulous questioning of plaintiff
regarding her medical history was necessary.

Considering the lack of medical opinion or other evidence on this point, and the lack of
an adequate explanation by the ALJ, it is impossible to determine how he arrived at the
conclusion that Ms. Brewer did not complain of any symptoms related to her conditions of
scleroderma or lupus during the relevant time period.

Because the ALJ failed to fully and fairly develop the record on which his decision was
based, it necessarily follows that the ALJ's decision is not supported by substantial evidence. See
*Thrasher,* 2013 U.S. Dist. LEXIS at \*4 (citing *Kane v. Heckler,* 731 F.2d 1216, 1219 (5th Cir.
1984) ("when an ALJ fails to develop the record, he does not have sufficient facts to make a
decision and, thus, his decision is not supported by substantial evidence")).

Here, the reviewing medical sources indicated that there was insufficient evidence to
fully assess plaintiff's claims. (Tr. 76, 78)  The ALJ recognized that the treating sources had not
stated whether their opinions related to the relevant period but he did not seek any clarification
from them. (Tr. 29)  Furthermore, the ALJ did not thoroughly question plaintiff regarding the
symptoms of her conditions and when she first began to experience them. (Tr. 55)  Thus, his
decision related to whether plaintiff was disabled during the relevant time period was not
supported by substantial evidence. Because the ALJ's decision was based on an incomplete
record and was not supported by substantial evidence, the undersigned recommends that it be
vacated and remanded.

C.      **Whether Plaintiff's Diagnosis of Scleroderma Met or Medically Equaled
Listing 14.04?**

Plaintiff also contends that because the ALJ did not adequately probe into plaintiff's

symptoms of scleroderma to determine an onset date, he failed to conduct a proper analysis on

whether she met the listed impairment for scleroderma under Listing 14.04.  In relation to

plaintiff's conditions of lupus and scleroderma, the ALJ stated the following, "While such

conditions eventually caused substantial limitations, there is no evidence that they existed prior

to the date last insured."

Social Security Ruling 83-20, 1983 SSR LEXIS 25 instructs that "[i]n addition to

determining that an individual is disabled, the decisionmaker must also establish the onset date

of disability.  In many claims, the onset date is critical; it may affect the period for which the

individual can be paid and may even be determinative of whether the individual is entitled to or

eligible for any benefits."  SSR 83-20, 1983 SSR LEXIS 25 also provides specific guidance on

determining an onset date when precise evidence is not available:

> In some cases, it may be possible, based on the medical evidence to reasonably
> infer that the onset of a disabling impairment (s) occurred some time prior to the
> date of the first recorded medical examination, e.g., the date the claimant stopped
> working. How long the disease may be determined to have existed at a disabling
> level of severity depends on an informed judgment of the facts in the particular
> case. This judgment, however, must have a legitimate medical basis.  At the
> hearing, the administrative law judge (ALJ) should call on the services of a
> medical advisor when onset must be inferred.  If there is information in the file
> indicating that additional medical evidence concerning onset is available, such
> evidence should be secured before inferences are made.
>
> If reasonable inferences about the progression of the impairment cannot be made
> on the basis of the evidence in file and additional relevant medical evidence is not
> available, it may be necessary to explore other sources of documentation.
> Information may be obtained from family members, friends, and former
> employers to ascertain why medical evidence is not available for the pertinent
> period and to furnish additional evidence regarding the course of the individual's
> condition. However, before contacting these people, the claimant's permission
> must be obtained. The impact of lay evidence on the decision of onset will be

> limited to the degree it is not contrary to the medical evidence of record. (In
> mental impairment cases, see SSR 83-15, PPS-96, Titles II and XVI, Evaluation
> of Chronic Mental Impairments. )
>
> The available medical evidence should be considered in view of the nature of the
> impairment (i.e., what medical presumptions can reasonably be made about the
> course of the condition). The onset date should be set on the date when it is most
> reasonable to conclude from the evidence that the impairment was sufficiently
> severe to prevent the individual from engaging in SGA (or gainful activity) for a
> continuous period of at least 12 months or result in death. Convincing rationale
> must be given for the date selected.

Here, the ALJ based his finding that plaintiff did not have scleroderma during the relevant time

period on a negative inference. He inferred that Ms. Brewer did not have this condition based on

a lack of evidence from the relevant time period. However, in the context of interpreting the

onset date, the absence of contemporaneous medical records does not preclude a finding of

disability. *Houston v. Comm'r of Soc. Sec.*, No. 10-CV-14831, 2011 U.S. Dist. LEXIS 143414,

2011 WL 6152992, at *12 (E.D. Mich. Sept. 30, 2011) (Michelson, M.J.), report and

recommendation adopted, 2011 U.S. Dist. LEXIS 142167, 2011 WL 6152982 (E.D. Mich. Dec.

9, 2011) (O'Meara, J.) (citing *Plumley v. Astrue,* No. 2:09-CV-42, 2010 U.S. Dist. LEXIS 11296,

2010 WL 520271, at *5 (D. Vt. Feb. 9, 2010) ("[A]lthough objective medical evidence is

necessary to establish the existence of a disabling impairment, . . . if a claimant has already been

found to suffer from a disabling impairment, objective medical evidence, while preferred, is not

essential to resolving the onset date of that disability." (internal citations omitted)); *Moriarty v.*

*Astrue,* No. 07-CV-342-SM, 2008 U.S. Dist. LEXIS 67215, 2008 WL 4104139, at *6 (D.N.H.

Aug. 28, 2008) ("Nowhere in [SSR 83-20, 1983 SSR LEXIS 25] is there any suggestion that the

absence of medical records establishing an onset date is fatal to an individual's disability claim.

In fact, the SSR provides just the opposite, specifically noting that in some cases it may be

necessary to infer the onset date of a claimant's disability from non-medical evidence.")).

The undersigned recommends remand so that the ALJ may call a medical advisor or otherwise secure additional evidence in order to properly determine the onset date of plaintiff's scleroderma and lupus.

### D.  Whether Plaintiff's Mental Impairments Met or Medically Equaled Listings 12.04 or 12.06 ?

Plaintiff argues that the ALJ erred in finding that her mental impairments did not meet or medically equal the criteria for Listings 12.04 or 12. 06.  (Doc. 10, p. 12-16)  In order to qualify as "disabled" under a Listing in the Secretary's regulations, a claimant must demonstrate that he or she meets all of the criteria contained in the Listing.  *See Duncan v. Sec'y of Health & Human Servs.,* 801 F.2d 847, 855 (6th Cir. 1986)  Alternatively, "[a] claimant can demonstrate that she is disabled because her impairments are equivalent to a listed impairment by presenting 'medical findings equal in severity to all the criteria for the one most similar listed impairment."  *Foster v. Halter,* 179 F.3d 348, 355 (6th Cir. 2001).  "This decision must be based solely on medical evidence supported by acceptable clinical and diagnostic techniques."  *Land v. Secretary of Health and Human Services,* 814 F.2d 241, 245 (6th Cir. 1986).

Ms. Brewer contends that the ALJ failed to properly evaluate whether one or more of her mental impairments met Listings 12.04 and 12.06.  Under the technique set out in 20 C.F.R. § 404.1520a, the Commissioner must rate the degree of the claimant's mental limitations in four broad functional areas:

1. activities of daily living;

2. social functioning;

3. concentration, persistence, or pace; and

4. episodes of decompensation.

29

Then, the Commissioner compares these ratings to the criteria in the appropriate listings. If the ALJ finds that the claimant's mental impairments do not cause "marked" limitations in at least two of the functional areas, then plaintiff's limitations have not met or equaled Part B of Listings 12.04 or 12.06. "A marked limitation may arise where several activities or functions are impaired or even when only one is impaired, as long as the degree of limitation is such as to interfere seriously with [the claimant's] ability to function independently, appropriately, effectively, and on a sustained basis." *Rabbers v. Comm'r of Soc. Sec.,* 582 F.3d 647, 652-53 (6th Cir. 2009).

Here, the ALJ determined that Ms. Brewer had moderate restrictions in activities of daily living; moderate difficulties in the area of social functioning; moderate difficulties in the area of concentration, persistence of pace; and had not suffered any episodes of decompensation for extended periods.

Plaintiff contends that her mental impairments resulted in more than moderate limitations. (Doc. 17, p. 14) In support of this argument, plaintiff points to her history of sexual abuse and the fact that she rarely left her bed and engaged in almost no activity. However, her "generalized assertion of functional problems is insufficient to demonstrate medical equivalence to a Listing at Step Three of the sequential evaluation process." *Tacket v. Apfel,* 180 F.3d 1094, 1100 (9th Cir. 1999). Rather, to meet a listed impairment, the claimant has the burden of showing she met each element described in the listing. *Sullivan v. Zebley,* 493 U.S. 521, 530 (1990).

Conversely, the ALJ pointed to facts in the record, mostly from the treatment notes of Kristine Jordan, to support his determination that plaintiff had only moderate limitations in activities of daily living. However, as noted above, the ALJ assigned little weight to the opinion

of Kristine Jordan that plaintiff had significant mental dysfunction.  Indeed, the ALJ assigned little weight to all of the medical opinions in the record.  He disagreed with the state agency psychological consultant, Kristen Haskins, Psy.D., who opined that there was insufficient evidence in the record to evaluate plaintiff's mental conditions prior to the date last insured.  The Sixth Circuit has stated that "generally, the opinion of a medical expert is required before a determination of medical equivalence is made." *Manson v. Comm'r of Soc. Sec.,* 2013 U.S. Dist. LEXIS 96128 (Eastern Dist. Michigan, June 13, 2013)  (citing *Retka v. Comm'r of Soc. Sec.,* 70 F.3d 1272 (6th Cir. 1995))

At the beginning of his step three discussion, the ALJ stated that "[n]o treating or examining physician has indicated findings that would satisfy the severity requirements of any listed impairment."  However, neither the ALJ, nor this court, possesses the requisite medical expertise to determine whether plaintiff's impairments equal one of the Commissioner's listing. *Harris v. Comm'r of Soc. Sec.* 2013 U.S. Dist. LEXIS 39950, (E.D. Mich. Mar. 22, 2013).   For this reason, the undersigned recommends that the case be remanded so the ALJ can properly make an equivalency determination after consulting with a Commissioner-appointed medical expert or experts.

### E. Plaintiff's Competence to Represent Herself at the Hearing

Plaintiff also contends that the ALJ did not properly assess whether she was competent to proceed in the hearing unrepresented by counsel.  Defendant contends that the ALJ adequately advised plaintiff of her right to representation and plaintiff received a full and fair hearing.  The undersigned agrees with defendant that the ALJ adequately advised plaintiff of her right to representation; that she knowingly chose to proceed with the hearing; and that the ALJ had no further duty to discuss this issue with plaintiff.  *See Duncan v. Sec'y of Health and Human*

31

*Servs.,* 801 F.2d 847, 855 (6th Cir. 1986).  However, if the court remands this case, as the undersigned is recommending, this argument will be rendered moot.

### F.    Plaintiff's Credibility

Finally, plaintiff argues that the ALJ improperly assessed her credibility by considering the fact that she had not been diagnosed with the conditions of lupus or scleroderma during the relevant time period.  Plaintiff cites case law noting that some conditions are hard to diagnose.  See *Stark v. Weinberger,* 497 F.2d 1092 (7th Cir. 1974).  Plaintiff argues that her credibility should not have been discounted on the ground that she failed to pursue or obtain an earlier diagnosis of these conditions.  The undersigned is recommending that this case be remanded for various reasons.  It seems likely that if the record is further developed and the Commissioner obtains additional medical advice and medical opinions, the ALJ's findings related to plaintiff's credibility may require modification.  Although an ALJ's credibility finding is entitled to great deference, the undersigned recommends that the plaintiff's credibility be reassessed after the record has been further developed as recommended in this report.

## VIII.  Conclusion

For the foregoing reasons, I recommend that the final decision of the Commissioner be VACATED and that the case be REMANDED, pursuant to 42 U.S.C. § 405(g), for further proceedings consistent with this Report and Recommendation.

Dated:  December 12, 2016

Thomas M. Parker

United States Magistrate Judge

_____

**OBJECTIONS**

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after being served with a copy of this document.  Failure to file objections within the specified time may waive the right to appeal the District Court's order.  See *U.S. v. Walters*, 638 F.2d 947 (6th Cir. 1981).  See also *Thomas v. Arn,* 474 U.S. 140 (1985), reh'g denied, 474 U.S. 1111 (1986).